UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GINA ASKEW,                           :
                                      :
        Plaintiff,                    :
                                      :
    v.                                : Civil Action No. 08-1755 (JR)
                                      :
MERIDIAN IMAGING SOLUTIONS, INC.      :
d/b/a MERIDIAN IMAGING                :
SOLUTIONS, *et al.*,                  :
                                      :
        Defendants.                   :

### MEMORANDUM

Gina Askew sues her former employer Meridian Imaging Solutions, Inc., and several of the company's employees and shareholders, alleging that she was treated poorly, and eventually fired, because of her efforts to seek medical treatment and to utilize available worker's compensation laws after suffering an on-the-job injury.  Her claims are for retaliatory termination after she revealed her intent to file a worker's compensation claim, invasion of privacy (a Meridian employee allegedly remained in the examination room when the plaintiff was examined by a doctor), and intentional infliction of emotional distress.  The defense has filed for summary judgment as to the first count, [Dkt. #7], and for judgment on the pleadings as to counts two and three, [Dkt. #9].  For the reasons set forth in this memorandum, those motions will be granted.

**Motion to Dismiss**

A motion under Fed.R.Civ.P. § 12(c) may be granted when the movant shows that "no material fact is in dispute and that it is entitled to judgment as a matter of law." *Khadr v. Bush*, --- F.Supp.2d ----, 2008 WL 4966523 *2 (D.D.C. 2008) (*citing Peters v. Nat'l R.R. Passenger Corp.*, 966 F.2d 1483, 1485 (D.C.Cir. 1992); Fed.R.Civ.P. §§ 12(c) and 56(c). When evaluating a motion under Rule 12(c) the court will accept as true and accord reasonable inferences to the allegations made in the non-movant's pleadings. *Schuchart v. La Taberna Del Alabardero, Inc.*, 365 F.3d 33, 34 (D.C. Cir. 2004); *Haynesworth v. Miller*, 820 F.2d 1245, 1249 fn. 11 (D.C. Cir. 1987).

**The Complaint**

The following allegations of fact are taken as true for purposes of this motion: The plaintiff was hired in June 2007 to work as a dispatch operator in Meridian's Alexandria, Virginia, location. One month later, she was transferred to work as a facilities administrator at Meridian's facility at 18th Street, N.W. in the District of Columbia, which provides copying services for the American Red Cross. Compl. ¶¶ 11, 12. In late December 2007, she fell from a chair while reaching for a Post-it note. *Id.* ¶ 14. She called Kristan Dixon, Meridian's human resources director, to tell her about the accident. Dixon told her to go to the emergency room, and that the expenses were covered by

workman's compensation.  *Id.* ¶ 17.  When the hospital would not process the plaintiff for examination without certain payment information she used her own insurance.  *Id.* ¶ 19.  She was eventually discharged and told to go to an orthopedist.  *Id.* ¶¶ 20-21.

Dixon assured the plaintiff that she would provide the appropriate worker's compensation paperwork so that the plaintiff could set up an appointment with an orthopedist, but she failed to do so twice, both times within a week of the plaintiff's injury.  *Id.* ¶¶ 22, 23.  The plaintiff proceeded to set up an appointment with the orthopedist herself, using her personal insurance.  *Id.* ¶ 23.  When Dixon found out that the plaintiff had used her own insurance, her reaction was to tell the plaintiff that she had only a slight strain, *id.* ¶ 26, and then a few days later to require the plaintiff to cancel the appointment and reschedule with a doctor approved by the worker's compensation company.  *Id.* ¶ 28.  The plaintiff balked at the delay, claiming that she was in severe physical pain.  *Id.* ¶ 28.  Dixon suggested that the plaintiff go back to the emergency room.  The plaintiff again requested via email the worker's compensation information, but Dixon did not respond.  *Id.* ¶ 30.

Later that same day, the plaintiff's workplace was changed.  She was transferred to Meridian's facility on 2025 E

Street N.W., in D.C., which also provided copy services to the Red Cross.  *Id.* ¶ 29.

The next day the plaintiff went to the emergency room, *id.* ¶ 31, and the day after that she was told to report to Meridian's Alexandria, Va. office.  There Dixon told the plaintiff that she "has no rights, that the decisions were those of the insurance company, that she could contact the Worker's Compensation Board in Richmond, VA if she had any questions," and that Dixon had called the orthopedist with whom the plaintiff had made an appointment, Dr. Koenig, to say that Meridian would not pay for the visit.  *Id.* ¶ 33.  When the plaintiff insisted on seeing Koenig, Dixon suggested three doctors approved by the worker's compensation insurance company, made an appointment for the plaintiff at a Dr. Alexander's office, *id.* ¶ 34, drove the plaintiff to the appointment, and filled out the appropriate paperwork, *id.* ¶ 35.  Dr. Alexander examined the plaintiff and diagnosed her with an "impacted" collarbone.  *Id.* ¶¶ 35-36.

The plaintiff followed Dixon's suggestion that she call the Worker's Compensation Board, and learned that she could get a referral from Alexander to Koenig.  Id. ¶ 37.  She made an appointment with Koenig, *id.* ¶ 38, and secured the referral from Dr. Alexander, *id.* ¶ 41, but she told nobody where she was when she went to this appointment, to prevent obstruction by others of her medical care.  *Id.* ¶ 43.

Dixon informed the plaintiff that she could make appointments with a physical therapist, as recommended by Dr. Alexander, for workdays after 3 P.M., and that she could go home afterward. *Id.* ¶ 39. The therapist could not always accommodate that schedule, so the plaintiff scheduled some appointments in the morning, and others back-to-back. *Id.* at ¶ 44. When Dixon found out about the appointments before 3 P.M., she called the therapist to reschedule them. *Id.* ¶ 45. As a result of this "meddling" the therapist would not schedule any new appointments, and as a consequence the plaintiff did not receive therapy for six weeks. *Id.* ¶ 46.

Dixon wrote up the defendant for being late to work, for not reporting to work after her therapy, and for unauthorized time out of the office (relating to her appointment with Koenig), *id.* ¶ 48. Over the course of the next month, Dixon "continually hounded and harassed the plaintiff regarding time and attendance as well as accountability issues," *id.* ¶ 50, and eventually wrote her up for these infractions too, *id.* ¶ 51.

In February 2008, Dr. Alexander set up a functional capability evaluation (FCE) test, *id.* ¶ 49, which the plaintiff took in March, *id.* ¶ 50. Afterwards, Dixon approached the plaintiff and asked why she had taken the test, stating that Dr. Alexander had said that it was cancelled. *Id.* ¶ 53. Later that month, Dixon again drove the plaintiff to an appointment

with Dr. Alexander, where the doctor confirmed that the FCE test had not been cancelled.  *Id.* ¶ 55.  Dixon entered the doctor's examination room and remained throughout the exam.  *Id.* ¶ 5.

Some days after the CFE exam, the worker's compensation claim representative told the plaintiff that she would be able to work.  *Id.* ¶ 57.  The plaintiff made an appointment in April 2008 with Dr. Alexander to review the FCE results.  *Id.* ¶ 58.  Dixon drove the plaintiff to this appointment, too, and she asked to speak with the doctor before the exam.  When the plaintiff "stated that she had no objections," Dixon and the doctor conferred outside.  *Id.* ¶ 59.  Dixon then asked to stay in the exam room again, but this time the plaintiff objected.  *Id.* ¶ 59.  When the doctor prescribed an MRI, Dixon made the appointment.  *Id.* ¶ 60.

Four days later, the plaintiff's employment was terminated.  *Id.* ¶ 61.  In July 2008, she was "given" twelve percent permanent disability for her shoulder injury by Dr. Alexander.  *Id.* ¶ 62.  The plaintiff asks for $7.5 million in damages.

**Invasion of Privacy**

The choice of law applicable to this claim is disputed.  The defendants urge the application of Virginia law, which would be dispositive because Virginia does not recognize claims for invasion of privacy.  The plaintiff, understandably, favors D.C.

law.  "When deciding state-law claims under diversity or supplemental jurisdiction, federal courts apply the choice-of-law rules of the jurisdiction in which they sit."  *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 858 (D.C. Cir. 2006) (*quoting Ideal Elec. Sec. Co. v. Int'l Fidelity Ins. Co.*, 129 F.3d 143, 148 (D.C. Cir. 1997)).  The jurisdiction in which I sit "follows the 'substantial interest' position of the Restatement (Second) of Conflict of Laws (1971) § 145, under which the court will 'balance the competing interests of the two jurisdictions, and apply the law of the jurisdiction with the more "substantial interest" in the resolution of the issue.'"  *Jaffe v. Pallotta TeamsWorks*, 374 F.3d 1223, 1227 (D.C. 2004).  "This inquiry is to include consideration of several contacts, including (1) the place where the injury occurred, (2) the place where the conduct causing the injury occurred, (3) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (4) the place where the relationship is centered."  *Jaffe*, 374 F.3d at 1227 (internal citation and quotation omitted).

   The plaintiff's invasion of privacy claim is based entirely on Dixon remaining in the room when the plaintiff was being examined by Dr. Alexander at his office in Alexandria, Virginia, and so both the injury and the conduct that caused the injury occurred in Virginia.  Compl. ¶¶ 70, 71.  Meridian also

has offices in Virginia, and the plaintiff was initially hired to work in the Alexandria copy center as a dispatcher.  Compl. ¶ 11.  These considerations, together with Virginia's interest in ensuring that its privacy law is consistently applied in doctor's offices within its borders, weigh conclusively in favor of Virginia law.  *See Jaffe v. Pallotta TeamsWorks*, 374 F.3d 1223, 1227 (D.C. 2004) (affirming the district court's choice of Virginia law for a negligence and wrongful death action when the plaintiff's "death and the medical care leading to it occurred in Virginia.").  Because Va.Code. Ann. § 8.01-40, which involves the misappropriation of an individual's likeness, provides the only remedy under Virginia law for invasion of privacy, the plaintiff's claim must be dismissed.  *WJLA-TV, et al. V. Levin*, 564 S.E.2d 383, 395 fn. 5 (Va. 2002).

**Intentional Infliction of Emotional Distress**

The parties also dispute the choice of law for the IIED claim, with the plaintiff again favoring District of Columbia law over Virginia law.  The choice here, however, involves distinctions with very little difference: As a matter of law, the facts alleged in the complaint cannot establish liability under either state's jurisprudence.

In D.C., "[t]o establish a *prima facie* case of intentional infliction of emotional distress, a plaintiff must show (1) extreme and outrageous conduct on the part of the

defendant which (2) either intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Larijani v. Georgetown University*, 791 A.2d 41, 43 (D.C. 2002) (emphasis in original). "The conduct alleged must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'"[1] *Bryant v. The Orkand Corp.*, 407 F.Supp.2d 29, 37 (D.D.C. 2005) (*quoting Homan v. Goyal*, 711 A.2d 812, 818 (D.C. 1998)). Similarly, in Virginia, "the tort has four elements that must be proved: 1) the wrongdoer's conduct was intentional or reckless; 2) the conduct was outrageous or intolerable; 3) there was a causal connection between the wrongdoer's conduct and the resulting emotional distress; and 4) the resulting emotional distress was severe." *Almy v. Grisham*, 639 S.E.2d 182, 187 (Va. 2007). The conduct alleged must be "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Almy*, 639 S.E.2d at 187 (*quoting Russo v. White*, 400 S.E.2d 160 (Va. 1991). "[L]iability arises only when the emotional distress is extreme, and only where the distress

---

[1] One decision states that an IIED case can be "made out only if the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim 'Outrageous!'" *Larijani v. Georgetown University*, 791 A.2d 41, 44 (D.C. 2002).

inflicted is so severe that no reasonable person could be expected to endure it." *See Russo v. White, 241 Va.*, 23, 400 S.E.2d 160, 163 (Va. 1991) (affirming demurrer when "t]here [wa]s no claim, for example, that she had any objective physical injury caused by the stress, that she sought medical attention, that she was confined at home or in a hospital, or that she lost income.").

The plaintiff's allegations of emotional distress in both the complaint and her declaration are entirely conclusory and unsupported by any specifics, and are therefore insufficient as a matter of law to support that element of her IIED claim. Nor does the plaintiff point to any specific factual allegation that would support a finding of sufficiently outrageous behavior, whether her employer's conduct is considered "intra-workplace" mistreatment, *Kerrigan v. Britches of Georgetowne, Inc.*, 705 A.2d 624, (D.C. App. 1997) (holding as insufficient to support an IIED claim allegations that an employer "targeted [the plaintiff] for a sexual harassment investigation, manufactured evidence against him in order to establish a false claim of sexual harassment, leaked information from the investigation to other employees, and unjustifiably demoted him to the position of store manager in order to promote a woman to his position.") (internal citation omitted), or otherwise, *see Kassem v. Washington Hosp. Center*, 513 F.3d 251, 255 (D.C. Cir. 2008)(holding as sufficient to

survive a motion to dismiss an allegation that "after [the defendant] fired [the plaintiff] from his position, it intentionally filed a false charge against him . . . a charge that could have prevented him from working as a nuclear technologist and subjected him to criminal penalties.").

### Summary Judgment

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists if the evidence "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986).

The parties agree that Virginia law applies to the retaliation claim. Pl. Opp at 15-20; MTD1 at 5-7. The relevant statute, Va. Code § 65.2-308, states that

> No employer or person shall discharge an employee <u>solely</u> because the employee intends to file or has filed a claim under this title or has testified or is about to testify in any proceeding under this title. The discharge of a person who has filed a fraudulent claim is not a violation of this section.

Va. Code Ann. § 65.2-308(A) (emphasis added). Even assuming that the plaintiff has produced enough evidence from which a reasonable jury could find both that the plaintiff intended to

file a worker's compensation claim and that her employers knew this, the plaintiff has failed to meet her burden of showing that retaliation was the sole reason for the discharge, because the defendants have produced unrefuted evidence that both economic factors and Meridian's internal policies played a large, if not definitive, role in the plaintiff's termination.

As discussed above, the plaintiff worked at facilities in D.C. in which Meridian provided copy services for the Red Cross. According to Meridian's uncontroverted evidence, by early 2007, about the time when the plaintiff began working at Meridian, the volume of copy services provided by Meridian to the Red Cross began to decline dramatically. MSJ at 2 (*citing* Edwards Aff. ¶ 9). In October 2007, Meridian and Red Cross officials met to discuss this decline and Meridian recommended cuts in staffing and photocopiers. Edwards Aff ¶ 9. By December 2007, Meridian stopped staffing its Red Cross copy facility in Virginia altogether. Edwards Aff ¶ 11. Things worsened to the point to where some months the 18th Street copy center had no copy projects at all. Edwards Aff. ¶ 15. In January 2008, the Red Cross publicly stated that it was cutting one third of its staff. Edwards Aff ¶ 16. Meridian again approached the Red Cross about reducing staff and removing unused equipment. Edwards Aff. ¶ 18.

According to Meridian's evidence, it was because of these economic factors that in April 2008, the defendants decided to eliminate a position at the 2025 E Street facility, where the plaintiff worked.  Edwards Aff ¶ 19; Dixon Aff ¶ 24; Opp ex. 5 (the plaintiff's severance letter).  Meridian's affiants also testify that it was Meridian's policy to eliminate the position of the last employee assigned to a facility.  Edwards Aff. ¶ 22; Dixon Aff. at 24.  This is supported by the text of the severance letter, and it is undisputed that the plaintiff was "last in." Opp ex. 5.

The plaintiff argues that the severance letter implies that the defendants had some discretion in their policy, that the existence of the policy is insufficiently supported, that the defendant has been inconsistent in its reasons for terminating the plaintiff, and that there is an admitted exception to the policy in that Meridian can also choose to discharge employees who had written warnings in their file and were already in jeopardy of being fired.  Opp. at 17.  But the purported inconsistencies for why Meridian terminated the plaintiff are unsupported by record citation, it is undisputed that neither of the other two employees being retained at the 2025 E Street location had ever been given written warnings, and the existence of the policy and its application to plaintiff are supported by both the severance letter and two affiants.  Edwards Aff. at 20;

Dixon Aff. at 23; Opp ex. 5.  The plaintiff also implies that Meridian transferred her to the 2025 E Street facility (four months before her discharge) in order to use the policy to fire her, Pl. Opp. 17-18, but this assertion is entirely unsupported and is contradicted by the defendants' evidence.

Given the undisputed evidence, no reasonable juror could find that plaintiff's intent to file a worker's compensation claim was the sole reason for her dismissal.

**Conclusion**

For the above discussed reasons, judgment will be entered for the defendants on the retaliation count, and the IIED and invasion of privacy counts will be dismissed.  An appropriate order will accompany this memorandum.


                                        JAMES ROBERTSON
                                   United States District Judge